Our next case on the docket today is 524-1070, People v. Deontay Robinson. Let's see, I've got Ms. Lassie and Ms. King. If you're ready, counsel, go right ahead. Thank you. May it please the Court? Counsel? My name is Jennifer Lassie with the Office of the State Appellate Defender, and I represent the Defendant Appellant Mr. Robinson. I would like to address Argument 2 first, which is the erroneous admission of People's Exhibit 12, and then Argument 1, which is the lack of sufficient evidence, because I believe that order makes the most sense in light of the facts. First, the trial court erred in admitting People's Exhibit 12 pursuant to the silent witness theory. This error was fully preserved, which means that if this Court agrees it was error, the State must show that it was harmless error, and that means the State has to show there's no reasonable probability a jury would have acquitted Mr. Robinson absent that error, and the State cannot do so because the trial court relied heavily on this ATM footage to place Mr. Robinson at the scene of the shooting minutes before it occurred. The problem with the ATM footage is we don't know when it started or when it ended, and from the time it begins, it skips and jumps ahead at least 15 times before Mr. Robinson exits the vehicle in front of that ATM, and the problem with those skips and freezes are we don't know how long they lasted or why they occurred. Ervin, the IT administrator from Earthmover Credit Union, went back and forth repeatedly during his testimony about what the file name meant for the recording. He said it could be when it started or when it ended. He didn't know. He also thought there were embedded timestamps in the video footage, but there's not, and the video has numerous freezes that were never explained. For example, after playing for only three minutes in real time, you'll see that the progress bar shows the video has played for more than 11 minutes. After the video plays for six minutes in real time, you'll see that the progress bar at the bottom of the screen shows it's played for 18 minutes. None of the detectives in the case knew when the video started, and they all guessed. Detective Hall claimed he was told when the video started, but he didn't know who told him, and he used whatever information he was told to estimate timestamps. I don't mean to interrupt, but I just have a question. Is there any question that the video was taken that night? Well, Your Honor, that's a good point. Thank you. That's a good question. Assuming that the file name is from when it started or stopped recording, then it's possible it was taken that night because the file name contains, I believe, the date and the timestamp. Here's the reason why I asked the question. You conceded on page 45 of your brief that the State arguably satisfied the tater factor of the identification of persons, locale, or objects depicted, because Irwin testified that he was asked to provide ATM footage from the ATM located on Oakland Avenue near LSB. I guess the fundamental question on the admissibility of evidence is for what purpose is being offered. The ATM video really doesn't do anything except put the defendant at the scene that night, along with 200 other people, but at the scene, right? Well, Your Honor, the trial court used it to put him at the scene minutes before the shooting. So that's the determinative issue, because there's no question he was present at this pajama party at LSB. You can see his very distinctive, highly reflective Adidas shirt in other footage. But admissibility and the way it could be given to evidence are two separate questions, aren't they? That's correct. But in order to be admissible, a proper foundation has to be laid, and a proper foundation can be laid in two different ways. We can have someone testify that this film accurately portrays what we claim it portrays. We didn't have that here. No one got on the stand and said, you know, this is what happened. I was there when Mr. Robinson got out, and this video shows this is what it looked like. And the other way is under the silent witness theory. And in order for it to come in that way, there's six different factors to tailor, and at least four of those weigh against admission. So I would urge this court to look at Taylor and consider the difference in that case versus in this case. In Taylor, the video jumped ahead, but an officer got on the stand and gave a reasonable explanation as to why it happened. He got on the stand and explained he was instructed by the store where he purchased the camera on how the camera works. He read the instruction manual. The camera was activated by motion. And then he explained that the camera would go dormant when it didn't sense motion for a number of seconds. I believe it was like 12 or 30 seconds. So in that case, there was a period of time where the defendant was behind a desk and not visible, not activating the camera, and so there was a jump in the recordings. But an officer in Taylor explained why that jump occurred exactly. And in this case, no one knows why the freezes occurred, which is why it wasn't admissible under the Taylor factors. Detective Hall, let's see, I believe, no, it was Detective Matthew, I believe, that looked into the freezes but could never find any explanation. So the problem with this video is that the trial court relied on it heavily because of all the issues with Jarvis' testimony. And the trial court repeatedly said if you just presented Jarvis' testimony alone, you would not have proven your case. And the court used this ATM footage to say Mr. Robinson got out of the car at 3.47 or 3.48 a.m., just minutes before the shooting happened at 3.50 or 3.51 a.m. So that's the problem with the ATM footage. It shouldn't have been admitted under the silent witness theory as we argue in Argument 2. But it also wasn't entitled to any weight in Argument 1 because of all the problems and defects with it. And then, so the trial court erred in admitting that footage. And it was not harmless and the state cannot demonstrate it was harmless. And that brings me to the issue with the lack of evidence that we argue in Argument 1. The trial court repeatedly noted Jarvis' testimony had problems and that he alone would not have been enough to convict. It's important to note Jarvis had great motive to lie. He was in jail on an unrelated first-degree murder charge. And he was testifying in exchange for a plea deal to second-degree murder. And for a 27-year-old man, he had an extensive criminal history. In addition to that murder charge that he was facing, he also had pending charges for armed robbery, attempt armed robbery, armed habitual criminal, unlawful possession of weapons, unlawful possession of controlled substance with intent to deliver, obstructing justice, and aggravated identity theft. And he also had prior convictions for obstructing justice, burglary, residential burglary, and mob action. So he wasn't a credible witness just to begin with. And that's before we even get to all the inconsistencies in his statements. In the state's response brief, the state claims that Jarvis initially refused to speak to police when they arrived on scene. But when we look at the record, that's false. Detective Ziltz's body camera footage, it's in People's Exhibit 1. It shows that Jarvis initially cooperated with police. He repeatedly answered questions when he was able to do so. For example, police asked him, where were you when the shooting happened? He answered. He, you know, told them the location. When police asked, where were the shooters, where was it coming from, he told them the location. When police asked, who were the shooters, he said, I don't know. When police asked him other questions about his brother, he answered. When police asked, what were the shooters wearing, he said, I don't know. The next day, he talked to Detective Kaler, and it was at that point he decided to say it was Mr. Robinson. Why his answer changed from the record, we don't know. But during that interview, he told Detective Kaler he was ducking down. Almost two years later, he claimed he was ducking down and looking back through the back window. And if you look at the record, you'll see that that back window was completely shattered. So it's impossible for him to look out the rear window. The state argues that perhaps he could have been looking out the rear passenger window. But I would ask this court to look at People's Exhibit 28A and 28B. It's like a bird's eye view, an overhead view that a police officer created of the scene. And I think it's not a reasonable inference that Jarvis, a 350-pound man in a small black Malibu, could be ducking down, facing the opposite direction, and also look out that rear passenger window and be able to see the shooters over 100 feet away in the dark. You'll notice when you look at the Oakwood tattoo footage, the shooters aren't visible. And when Mr. Robinson is visible in the bar footage from other cameras, his shirt almost lights up when light hits it. It's like a reflective kind of material. It looks like a glow-in-the-dark almost when you view that footage. So I would suggest that if Mr. Robinson had been one of the shooters, he would have been extremely easy to see, and Jarvis would have been able to say what he was wearing. And so I would argue that the State failed to present sufficient evidence of guilt, and the trial court's verdict largely rests on Jarvis, who was completely lacking in credibility, and the defective ATM footage, which is riddled with errors that were never explained below. And so unless this Court has questions, we would ask you to reverse outright or remand alternatively under Argument 2. There's none? No questions? Thank you. Thank you. May it please the Court, Counsel. My name is Tamber Cain. I'm here on behalf of the affilee, the people of the State of Illinois. Now, I'm going to address both issues 1 and 2, but I'm going to start with the sufficiency of the evidence. The standard here is very deferential. It's the light most favorable to the prosecution. And we're not here to re-weigh what the trial court found, which is exactly what the defendant is asking this Court to do. This was a bench trial. The judge heard the evidence. The judge found, on page 495 of the record, the evidence here was very strong that this defendant was the shooter. The trial court also found, at the record of 494, that Jarvis' statements to Officer Kaler, Detective Kaler, to be extremely credible. That's not lightweight. That's not wishy-washy. Very strong, very credible. I'm sorry, I have a question. I wonder if you could take a moment to distinguish one of the cases cited by the defense, People v. Smith. In that case, they wrote that, although the testimony of a single witness is sufficiently convicted, positive, and credible, given the serious inconsistencies in and the repeated impeachment of the witness, we find that no reasonable prior fact would have found her testimony credible. Moreover, the circumstantial evidence tending to link the defendant to the murder merely narrowed the class of individuals who may have killed the victim without pointing specifically to the defendant. Other men were with him. So you've got, in this case, a witness with a – eyewitness with a lengthy criminal history, some inconsistent statements to police on the body cam, David Smiley's testimony of prior inconsistent statements, a video cam that allegedly displaces the defendant there with 200 other people. How is Smith not controlling police? Your Honor, there's lots of reasons here. Let's start with the evidence that supports Jarvis McClellan's testimony. I'll be the first to admit, he does say, I don't know. He also says, I ain't got nothing to say to you. And there's a whole bunch of people around. Now, defense counsel says it was the next day when he gave his statement. It wasn't. The shooting happened at 340-something in the morning. Seven hours later, he gives his statement. Not days later. Seven hours later, he's still wearing the same clothes. He talks to Detective Kaler. He says multiple guns. There were multiple guns. We know that from the forensics. He says there were rapid fire, quickly. We know that because it matches up. He says the location. He says the shell casings were here. But he also says he saw the location. He says there were multiple people. He says they came around LSV, shot, and sped off. All of that matches up. So what we have is clearly he witnessed. He was able to give the details that he witnessed. Now, to the fact of this defendant, they make much of the fact that the Oakwood tattoo video is difficult to see. But Mr. Stonecipher, the owner of Oakwood, testifies that that camera is pointed right in front of his door and that the periphery is not as good as the video right in front of his door. However, the defendant had a great view. It was only a little over 100 feet, and the shooters were right underneath a light. I would propose that this was a defendant who was being uncooperative, not lacking knowledge. He was in a crowd. He had prior involvement with police. He didn't want to be seen talking to them. He kept walking away from them, pushing past them. But Detective Kaler said, I went to the hospital, and his father put me in touch with him. And if you look on the interview he gave with Detective Kaler, he asks, are you going to tell my father I talked to you? So I believe at that point, there was no one around to see him talking to the detectives. He wanted to be cooperative. He knew who it was. He had social media. He had a picture on Facebook. It said, this is the guy who did it. I'm paraphrasing. So you have all of that. It matches the forensics. He also says, my brother was shot trying to get in the car. They make a lot about the fact the back window is busted or the rear window. We don't know if it was the back window or the rear window. But there's nothing saying that rear window was busted when he looked through it. There were multiple gunshots. There were two or three in that rear window. It could have been the last two or three. He's a big man. He couldn't get very far down in that seat. He was going to be looking at something because he couldn't get his head lower. So back to your direct question. Here, we don't have just his testimony. We have his testimony with a whole lot of corroboration. And that allowed the trial court to say, yes, I find his testimony credible. So his testimony would be, well, the court says, it wouldn't be enough by itself. But I have all this other testimony, too. So we're not asking the court to decide solely on Jarvis. When you look at it, the court specifically references the timeline. We know that the defendants were at LSB at the pajama party. We know they left. We know they came back. And we know they came back sometime in the window of Exhibit 12. We see this defendant, distinctive shirt, braids, matching the physical description, get out of the vehicle. We see the vehicle back up. Then we see Jarvis McClellan and his brother come to their vehicle. We see two people shadowing get out and start firing. This all matches exactly what Jarvis said. Have I answered your question sufficiently, Your Honor? Yes, thank you. So I'd like to turn briefly to Exhibit 12. Exhibit 12 is only one of many exhibits. It was admitted under the silent witness doctrine. So was Exhibit 17 from the same video. The fact that we have Exhibit 17 from the same video satisfies several of the relevancy. We know that it was operational because we have 17 that came in. And we have 12. And the fact that there are flaws in 12 go to the weight of the evidence, not the admissibility. So the capability of recording is the first one. The competency of the operator, we see Mr. Irwin testify at length. This is his job. He routinely does this. He knows how to download it from the Internet. He frequently does this. So he has proved that he can operate it. The proper operation of the device, and I'm going to refer to people named Taylor again. The fact that the tape exists at all is evidence that the recorder was functional and the operator knew how to operate it. So the fact we have Exhibit 12 shows it was functional. There's a flaw in it, but it was functional. We have the chain of custody. That was proven out in evidence. And we have the identification of persons, locale, and objects. We clearly identify the defendant as well as one of the other co-defendant, well, one of the other perpetrators. The vehicle, the vehicle matches that on the vlog video. We also have the statement by the judge. He knows exactly where this is when he views it because he's like, oh, that used to be such and such. Now it's LSB. So the judge clearly recognized it from the video. As well as Detective Zill's body camera footage. He's walking around this. When he's walking around, his body camera footage shows the exact scene that Exhibit 12 does. So we have multiple things that show that that was the location. And we have other videos that show the defendant wearing that same outfit. This really comes down to a case of deference. This isn't, the defendant wants you to re-weigh the evidence. That's not the function. Here, we have deference to the court's credibility findings. He found Jarvis credible. He found the evidence credible. Deference to the Jackson Standard. In the light most favorable to the prosecution. And the evidentiary rulings of Exhibit 12 should be reviewed for abuse of discretion. Was this arbitrary or fanciful? No. I would submit to this court that it was not. Again, the trial court found that there was very strong evidence that the defendant was the shooter. I'm asking that this court defer to the trial court's finding and affirm the ruling. Thank you. Any questions, jurors? No, thank you. Thank you. Your Honors, no one is disputing that Jarvis was present during the shooting. That's a given. So that he knows it was multiple guns or that it was rapid fire is just simply irrelevant. He was clearly at the shooting. That just establishes he was present. It doesn't establish that Mr. Robinson was the shooter. And that's the dispute here. The state is still trying to argue that Jarvis was not cooperative when police first arrived on the scene. And that he was walking around and refusing to speak to police. He was walking around, but he was also speaking to police and answering their questions. Officer Ziltz asked him, what's your name? He says, Arion. His name is Arion, man. That's the first question they asked was, what's your brother's name? And they said, what's your name? My name is Jarvis McClellan, man. What is it? McClellan. He continues answering. Where were you at, boss? I was where I was. I was in the car. Can you tell me who shot at him? I don't know. You don't know? No. Where was it coming from? Over here. Over here? Yeah. He continues answering questions. It's only when he doesn't know the answer that he says, I don't know. But he's cooperating. Like, in a car? Were they in a car? No, they weren't in no car. Okay, what were they wearing? I don't know. This is intermingled with the questions he's answering. This isn't a refusal to cooperate. And that's on People's Exhibit 8. It's only after all of this conversation, Jarvis gets on the phone with someone else and is, I guess, relaying the information to them about the shooting occurring. And at that point, he stops cooperating and he stops answering questions. But until that point, he's answering questions. And that's immediately after the shooting. Now, the state points out a few hours later, and we did argue the next day, I think seven or just 10 hours later, he speaks with Officer Kaebler. And I think a reasonable inference is that at that point, Jarvis has formed the belief that Mr. Robinson is the shooter based on information that we don't have in this record. But I think that's a reasonable inference for us to have in light of the fact that hours before, he says, I don't know who the shooter was and I don't know what they're wearing. Then hours later, he's telling police he does know who the shooter is and he's providing a social media picture. So I think it's a reasonable inference that at that point, he's received some sort of information. I've got a question. You're asking us to substitute our judgment for the trial courts by what's reasonable? No, Your Honor. But the trial court is entitled to deference. However, when a witness is so inconsistent and so unreliable, you're not conclusively bound to follow the trial court's determination on credibility. And we have that here with Jarvis. Initially, he says he doesn't know who the shooters are or what they're wearing. Hours later, he says the shooter is Mr. Robinson. And he also says at that point, I believe in that second statement, he says he doesn't know if there was another shooter. And then by February 2024, he claims that there was a second person. And it's not until February 2024, almost two years later, that he discusses what Mr. Robinson is wearing. And it's at that point he's also learned after being in jail who the other shooter was. So I believe Mr. Jarvis has received information by the time of that February 2024 interview because he's got the second alleged shooter's name. And he also, you know, states what Mr. Robinson is wearing. The state argues there was other testimony to rely on. The state's argument about someone claiming, about a bar employee saying that someone walked behind the bar in the clothes that Mr. Robinson was wearing, I think that person testified it was a person in a T-shirt coming behind the bar with a black and white T-shirt. Mr. Robinson was wearing a sweatshirt. And as far as the fact that he was a black man with dreads in his hair, if you look at that LSD footage, you will see hundreds of people in that bar. And a large majority of them are black men and women. And a great deal of them have dreads in their hair. So the fact that a person walked behind the bar in a T-shirt that might have looked similar to Mr. Robinson's sweatshirt, I don't think establishes the state's case either. I did not know if Your Honors had any questions about the evidence or the Taylor factors. No, thank you. You've answered the question. Appreciate it. We would ask this court to find that the evidence was insufficient as raised in Argument 1, and that requires reversal of the conviction. And alternatively, if this court does not find in Mr. Robinson's favor in Argument 1, we would ask that under Argument 2 you find that it was error to admit in People's Exhibit 12 and that that error was not harmless and reverse the remand for a new trial. Thank you, Counsel. Obviously, we will take the matter under advisement. We will issue an order in due course.